UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| PETER J. SPAKOSKY,      ) | |
|     ) | |
| Plaintiff,     ) | |
|     ) | |
| v.     ) | No. 1:23-cv-070-MJD |
|     ) | |
| MCMINN COUNTY, TENNESSEE,     ) | |
| CALEB LATHAM, RALPH CREEL,     ) | |
| JEREMY HARRISON,     ) | |
|     ) | |
| Defendants.     ) | |

**MEMORANDUM AND ORDER**

Defendants Caleb Latham, Ralph Creel, and Jeremy Harrison (the "Officers"), who at all relevant times were deputies with the McMinn County Sheriff's Office (the "MCSO") were dispatched to the home of Plaintiff Peter Spakosky ("Plaintiff") at around 2:00 a.m. on April 3, 2022, in response to a noise complaint made by Plaintiff's neighbor earlier in the evening. The encounter ended with Plaintiff being shot at least four times. Plaintiff filed this civil rights lawsuit against the Officers and McMinn County (the "County," together with the Officers, "Defendants"). Currently before the Court are (1) Plaintiff's Motion for Partial Summary Judgment [Doc. 63 (motion); Doc. 64 (brief)]; and (2) Defendants' Motion for Summary Judgment [Doc. 68]. The parties filed responses in opposition to one another's motions [Doc. 72; Doc. 76; Doc. 77], supplemental briefs [Doc. 82; Doc. 83], and a Joint Statement of Undisputed Material Facts [Doc. 85 ("Joint Statement")].[1]

---

[1] The Court struck the parties' separately filed statements of "undisputed" material facts and responses thereto. [*See* Doc. 81].

The motions are therefore ripe, and the Court conducted a hearing on the motions on May 14, 2026 (the "Hearing").  As set forth below, Plaintiff's motion for partial summary judgment [Doc. 63] will be denied, and Defendants' motion for summary judgment will be granted in part and denied in part.

## I. BACKGROUND

The following is taken from the Joint Statement and from video recordings of the relevant events taken by the Officers' body-worn cameras.[2] McMinn County 911 Dispatch received a call at about 1:30 a.m. on April 3, 2022, from Plaintiff's neighbor, John Garland. Mr. Garland complained that Plaintiff was "having some kind of party" and playing music extremely loudly [Doc. 78, recording of phone complaint]. Mr. Garland stated, "They were over there shooting guns earlier, so be careful." [*Id.*]. Officers were dispatched to Plaintiff's home shortly after Mr. Garland's call [Doc. 68-1]. There was no noise ordinance in effect in McMinn County, but the MCSO has a policy of responding to "every call, even non-emergency calls, that comes in through the 911 system no matter if it references a crime or not." [Doc. 85 at Page ID # 892]. In addition, Plaintiff lives in a rural area of the County, and the Officers "expect homeowners in the area . . . to own firearms," and acknowledge that homeowners "frequently answer the door with [their firearms]." [*Id.* at Page ID # 897].

---

[2] In the Joint Statement and in their briefing, the parties sometimes cite to bodycam video files stored on flash drives the parties manually filed on the docket of this case [Doc. 65; Doc. 69; Doc. 78]. During the Hearing, Plaintiff also entered clips and stills from the same bodycam footage into evidence, without objection. In this Memorandum and Order, the Court will cite to the exhibits entered during the Hearing, which reflect different time stamps for the same events. For example, in Hearing Exhibit 4, the shots are fired at 1:56:19, but in Hearing Exhibit 3, the shots are fired at 1:57:24. Meanwhile, in Hearing Exhibit 1, the Officers are knocking on the back door of Plaintiff's house (before the shots), beginning at about 2:07:30. The Court will cite to the time stamp of the particular exhibit being cited (*e.g.*, "Hearing Ex. 2 at 2:11:03").

2

At the time of the incident in question, Plaintiff lived in a trailer at the end of a steep driveway (the "Trailer"). Officers Harrison and Creel were the first to arrive, and Officer Harrison did not activate his blue lights. Officer Latham arrived soon after, parked about 100 feet down the hill from the Trailer, and activated his blue "cruise lights," which do not flash. The Officers did not attempt to make contact with Mr. Garland, the caller, before approaching the Trailer. The Officers got out of their cars and approached the Trailer on foot. Although they could hear music playing inside, they did not see a party or other gathering and did not hear any gunshots [*id.* at Page ID # 893–94]. The Officers did not have a warrant to arrest Plaintiff or search the Trailer [*id.* at Page ID # 894–95].

The Trailer had a front porch leading to the front door. However, the Officers observed—and the bodycam footage confirms—that the stairs to the porch were "rotted and detached" [*id.* at Page ID # 894, ¶ 17]. Officer Creel testified in his deposition that he "noticed that people had been walking around to the back door," which led him to conclude that people "usually use the back door." [Doc. 77-4 at Page ID # 697]. Accordingly, the Officers walked to the back of the Trailer, where Officer Harrison knocked on the back door approximately seven times, announced "Sheriff's Office," and shined a flashlight into the open and uncovered windows right next to the door [Doc. 85 at Page ID # 895; Hearing Ex. 1 at 2:07:39–2:07:52]. Plaintiff did not answer. Officer Harrison then knocked on the door 20 more times, this time using a flashlight, and again looked through the uncovered windows [Hearing Ex. 1 at 2:07:53–2:08:08]. Again, Plaintiff did not answer. Officer Harrison then knocked on the door 11 more times with his fist while another officer shined a flashlight through the uncovered window. [Hearing Ex. 1 at 2:08:20–2:08:30]. Again, there was no answer. Throughout the duration of the three sets of knocks on Plaintiff's back door (the "Back Door Knocks"), the bodycam footage supports Officer Latham's testimony that

3

the music inside the Trailer was so loud that the Officers could hear it from the outside [Doc. 77-6 at Page ID # 746].

The Officers then began walking back toward the front of the Trailer, in the direction of their patrol vehicles. As they did so, they continued announcing their presence, and allegedly "pounded on the walls" of the Trailer.[*id.* at Page ID # 895–96]. Again, they heard nothing from Plaintiff; just the continued sound of loud music blaring from the Trailer.

As they turned the corner to the front of the Trailer, one of the Officers can be heard saying "Yeah, that'd be kind of hard gettin' up them steps" while looking at the detached and rotted steps of the front porch [Hearing Ex. 2 at 2:09:04–2:09:08]. For the next minute-and-a-half, the Officers stood out in front of the Trailer flashing their flashlights, shouted "Hey!" one time, joked about cutting the power to get Plaintiff's attention, banged three times on the siding of the Trailer, and noted a suspicion that someone was inside and that "they know we're here." [Hearing Ex. 2 at 2:09:09–2:10:48].

Officer Latham then climbed up onto the front porch and bent over to peer through a window to the left of the door before saying "He's sitting right there," and noting to another officer that Plaintiff "is madder than f*#k." [Hearing Ex. 2 at 2:10:57–2:11:09; *see also* Doc. 85 at Page ID # 896–897 (noting Officer Latham "saw [Plaintiff] sitting on a couch looking down at a cell phone or tablet" and "look[ing] agitated.")]. Plaintiff later testified in his deposition that he heard banging coming from the front of his home, but did not hear the Officers shouting [Doc. 85 at Page ID # 896; Doc. 77-7 at Page ID # 755]. He explained that the banging woke him up and he looked down at his phone to see the time [Doc. 77-7 at Page ID # 755–56]. In other words, Plaintiff testified that he heard banging on the front door area, woke up, and checked his phone to see what time it was.

Officer Latham then walked up to the area between the front door and the window and used his flashlight to knock on the side of the Trailer 10 times, looked back through the window, announced that Plaintiff was looking down at his phone, used his flashlight to bang on the side of the Trailer 11 more times, shone the flashlight through the window, and yelled "Hey, Sheriff's Office!" [Hearing Ex. 2 at 2:11:23 – 2:11:50]. Officer Latham then announced Plaintiff had a gun, yelled "Sheriff's Office!" again, and backed up to the farthest corner of the front porch away from the door [Hearing Ex. 4 at 1:55:58 – 1:56:11].

By 1:56:10 on Hearing Exhibit 4[3], Officer Latham was positioned at the far corner of the front porch. The Officers, including Officer Latham, continued to loudly announce "Sheriff's Office! Drop the gun!" [Doc. 85 at Page ID # 898]. At 1:57:17 on Hearing Exhibit 4, Plaintiff can clearly be seen opening and stepping through the threshold of the front door, holding a gun and beginning to raise it. He yelled, "[w]hat the F**k are you doing?" [Doc. 85 at Page ID # 899]. At 1:57:18 on Hearing Exhibit 4, Plaintiff continues to raise the gun, and at 1:57:19, multiple shots are fired, at least four of which hit Plaintiff. Plaintiff did not fire his gun.

Within 30 seconds of the shooting, one of the Officers called for EMS [Doc. 85 at Page ID # 901]. Within three minutes, the Officers had also radioed for medical supplies, and within eight minutes, an officer was on the porch with a medical supply bag and at least two officers began tending to Plaintiff's wounds, including Officer Harrison. Within ten minutes, EMS arrived and promptly began treating Plaintiff's wounds [*id.*].

In addition to the foregoing, the Joint Statement reflects that the parties agree to the following: (1) Officers Latham and Harrison each fired their guns at Plaintiff; (2) the Officers did not warn Plaintiff that he would be shot if he did not lower his gun; (3) Plaintiff did not verbally

---

[3] The video file labeled "Shooting 1 Harrison.MP4" from the manual filing at Docket No. 65 reflects the same time stamp.

threaten the Officers or fire his own gun; (4) as Plaintiff was stepping out onto the porch, the Officers were "utilizing bright take down lights to illuminate the scene," and Officer Latham had "unholstered his weapon and activated his firearm mounted tactical light[;]" (5) one purpose of both types of lights is to "disorient" a person; and (6) Plaintiff had "No Trespassing" signs posted on his property [Doc. 85 at Page ID # 899–900].

Plaintiff was charged in state court with three counts of aggravated assault (one for each of the Officers) via an "Affidavit of Complaint" signed by MCSO Brad Johnston [*id.* at Page ID # 901]. The state court dismissed the count as to Officer Creel during pretrial motion practice, and the counts as to Officers Harrison and Latham proceeded to a jury [*id.* at Page ID # 902]. Plaintiff was acquitted on the count against Officer Harrison and acquitted of aggravated assault as to Officer Latham, but convicted of the lesser included charge of simple assault [*id.*]. The state court "granted a judicial diversion" to Plaintiff on December 8, 2025 [*id.*].

Plaintiff filed suit in this Court on March 31, 2023. Initially, Plaintiff sued the Officers, the County, MCSO Sheriff Joe Guy, and Sergeant Brad Johnston. Shortly after the case was filed, however, the parties stipulated to the dismissal without prejudice of all claims asserted against Sheriff Guy and Sergeant Johnston [Doc. 16; Doc. 17]. The case was then stayed during the pendency of Plaintiff's state court criminal charges. On December 11, 2025, shortly after Plaintiff was granted a diversion on his assault conviction by the state court, this Court ordered a new trial date and reset all pretrial deadlines [Doc. 54].

## II.     STANDARDS

### a.     Summary Judgment

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that *matters*—i.e., a fact that, if found to be true, might "affect the outcome" of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" dispute exists with respect to a material fact when the evidence would enable a reasonable jury to find for the non-moving party. *Id.*; *Jones v. Sandusky Cnty., Ohio*, 541 F. App'x 653, 659 (6th Cir. 2013); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). In determining whether a dispute is "genuine," the Court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson*, 477 U.S. at 249. Instead, the Court must view the facts and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports*, 253 F.3d at 907.

The moving party bears the initial burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Id.* at 323. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248, 249; *Nat'l Satellite Sports*, 253 F.3d at 907.

The standards upon which the Court evaluates motions for summary judgment do not change when, as here, both parties seek to resolve the case through the vehicle of cross-motions for summary judgment. "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts."

7

*Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1999) (citations omitted). "Rather, the Court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

  **b.**  **Qualified Immunity**

  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It provides law enforcement officers with "breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (*quoting Stanton v. Sims*, 134 S. Ct. 3, 5 (2013)); *see also Lemmon v. City of Akron*, 768 Fed. App'x 410, 414 (6th Cir. April 4, 2019) ("The doctrine of qualified immunity insulates state actors from liability in close-call situations."). In the context of deadly force, the Sixth Circuit has instructed lower courts to recognize qualified immunity if officers of reasonable competence could disagree on the issue. *Id.*

  Where, as here, an officer asserts qualified immunity as a defense at the summary judgment stage, the burden shifts to the plaintiff to demonstrate that: (1) the facts, taken in the light most favorable to the plaintiff, show that the officer's conduct violated plaintiff's constitutional right, and (2) the right was so clearly established at the time of the officer's conduct "that a reasonable official would understand what he is doing violates that right." *Tanner v. Walters*, 98 F.4th 726, 731 (6th Cir. 2024) (internal citations omitted); *see also Johnson v. Hamilton Cnty.*, No. 1:19-cv-304, 2023 WL 11979766, at *5 (E.D. Tenn. Mar. 29, 2023) ("A right is clearly established when, 'at the time of the challenged conduct, the contours of [the] right are sufficiently clear that every

reasonable official would have understood that what he is doing violates that right.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))).

Importantly for purposes of this case, "[w]hen a defendant invokes qualified immunity in a motion for summary judgment, the plaintiff must offer sufficient evidence to create a genuine dispute of fact that the defendant violated a clearly established right." *Tanner*, 98 F.4th at 731–32 (quoting *Folks v. Petitt*, 676 F. App'x 567, 569 (6th Cir. 2017)); *see also Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) ("In the qualified immunity context, if the facts alleged and evidence produced, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that the officer violated a clearly established constitutional right, dismissal by summary judgment is inappropriate."). "'There is, however, an added wrinkle' where the record contains 'a videotape capturing the events in question.'" *Shumate v. City of Adrian*, 44 F.4th 427, 438 (6th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "Because facts must be viewed in the light most favorable to the non-moving party only if there is a *genuine* dispute as to those facts, we may not adopt a version of the facts that is blatantly contradicted by video footage that is not doctored or altered in any way and which clearly depicts . . . the events that actually happened." *Id.* (internal citations and quotation marks omitted).

## III.    ANALYSIS

Plaintiff lists ten "Causes of Action," or counts, in his complaint. Counts I through IV allege violations of Plaintiff's rights under the United States Constitution, pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Counts V through X allege violations of state law.

9

### A. Narrowing the Scope of Claims at Issue

Plaintiff's complaint and his briefing on summary judgment are, at many points, confusing, convoluted, and internally inconsistent. Accordingly, the Court began the Hearing by asking Plaintiff to articulate the legal and factual bases for each count in the complaint and to identify the claims on which he seeks summary judgment. Defendants did not object during the Hearing to Plaintiff's commentary regarding the nature of his claims and arguments. Therefore, the Court's rulings herein are based on the claims and arguments as the Court construes them based on the parties' representations made during the Hearing. To the extent the written record reflects arguments or claims different from or inconsistent with those addressed during the Hearing, the Court finds such arguments and/or claims have been abandoned, and the Court will not address them here.

In particular, it is now clear that Plaintiff is not pursuing a standalone claim for any alleged violation(s) of his rights under the Second Amendment or Fourteenth Amendment. Plaintiff's counsel clarified during the Hearing that his references to the Fourteenth Amendment were only for the purpose of applying the Fourth Amendment to the Officers, who are all state actors. In addition, Plaintiff agreed that Count V ("T.C.A. § 29-20-101/Tennessee Common Law (Negligence)"), and Count VI ("T.C.A. § 29-20-101/Tennessee Common Law (Negligent Supervision)") are both subject to dismissal pursuant to the "civil rights exception" to the removal of immunity under the Tennessee Government Tort Liability Act ("GTLA"), Tennessee Code Annotated § 29-20-205. Count I will therefore be dismissed to the extent it could be interpreted as asserting any claims under the Second or Fourteenth Amendments, and Counts V and VI will be dismissed in their entirety.

With that initial clarification, what remains are Fourth Amendment claims against the Officers in their individual and official capacities, *Monell* claims against the County, and state law claims against the Officers. During the Hearing, Plaintiff explained that his Fourth Amendment claims are based on his allegations that the Officers: (1) exceeded the permissible scope of the "knock-and-talk" rule as set forth in *Florida v. Jardines*, 569 U.S. 1 (2013) and its progeny and engaged in an unreasonable search and/or seizure; and (2) used unreasonable or excessive force when they shot Plaintiff. Plaintiff further explained that he contends the County is liable for these violations under *Monell*, based on the MCSO's allegedly unconstitutional official policy related to responding to 911 calls and the County's alleged failure to properly train the Officers regarding uses of force.

As for his state law claims, Plaintiff explained that (1) his negligence claim is based on the Officers' alleged failure to take "obvious and available steps to properly identify themselves" during the minutes leading up to the shooting[4]; (2) his negligent or intentional infliction of emotional distress ("NIED" and "IIED") claim is based on the shooting and on the alleged "delay in providing treatment" to Plaintiff[5]; (3) his assault claim is based on the shooting; and (4) his false arrest is based on the shooting and his subsequent arrest without probable cause.

In the pending motions, Plaintiff moves for summary judgment only as to his excessive force/assault claims against the Officers related to the shooting. Defendants move for summary judgment on all claims as to all Defendants on a number of grounds, including, *inter alia*, qualified immunity as to the Fourth Amendment claims against the Officers, and a lack of notice required for *Monell* claims against the County. The parties' arguments are addressed in more detail below.

---

[4] Hearing at 1:10:10–1:10:26.

[5] Hearing at 1:09:30–1:09:55.

### B.     Plaintiff's Excessive Force Claim

Plaintiff's Fourth Amendment excessive force claim is based on the shooting. "The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive use of force by law enforcement officers." *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015). "The reasonableness of a use of force is assessed from the perspective of a reasonable officer on the scene without the benefit of '20/20 vision of hindsight.'" *King v. City of Rockford*, 97 F.4th 379, 393 (6th Cir. 2024) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "This inquiry entails consideration of the totality of the circumstances, including, but not limited to: (1) 'the severity of the crime at issue;' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others;' and (3) whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight.'" *Id.*

Under the objective reasonableness standard, "a court considers whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Godawa*, 798 F.3d at 464 (citation omitted). Courts must also "account for the fact that, when faced with 'rapidly evolving' and tense situations, 'police officers are often forced to make split-second judgments' in deciding how much force is necessary given the circumstances." *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014)).

The Court has reviewed the bodycam footage carefully and finds it clearly depicts Plaintiff exiting his home with a gun in one hand before, as Plaintiff is facing Officer Latham, raising the gun, grasping it with both hands, and pointing it directly at Officer Latham, while Officer Latham yells "Sheriff's Office! Drop the gun!" [Hearing Ex. 3]. No reasonable juror could view the bodycam footage in this case and conclude otherwise, and Plaintiff's counsel conceded as much

at the Hearing.[6] Indeed, the parties' dispute regarding Plaintiff's excessive force claim does not center on the shooting itself, but on the significance of the moments leading up to the shooting (*i.e.*, between the time the Officers arrived at Plaintiff's home and the time the shots were actually fired), which the bodycam footage clearly depicts as well.

In particular, the parties dispute the import of *Barnes v. Felix*, 605 U.S. 73 (2025), in which the United States Supreme Court considered and rejected the Fifth Circuit's "moment of threat doctrine," which (1) applied only in excessive force cases involving deadly force; and (2) required courts to consider the circumstances *only* as they existed in the actual moment before the deadly force was used (which, in *Barnes*, was a two-second period of time). *Id.* at 78. The Supreme Court held that the "'totality of the circumstances' inquiry into a use of force has no time limit," such that courts must consider "any relevant events coming before" the moment of threat. *Id.* at 80, 83. The Court reasoned that "no rule that precludes consideration of prior events in assessing a police shooting is reconcilable with the fact-dependent and context-sensitive approach we have prescribed" for analyzing uses of force, and that a "court deciding a use-of-force case cannot review the totality of the circumstances if it has put on chronological blinders." *Id.* at 82.

Based on *Barnes*, Plaintiff argues "the totality of the circumstances demonstrate[s] that the shooting resulted from Defendants' decision to impermissibly and unconstitutionally remain on his property after well-established constitutional requirements demanded that Defendants leave." [Doc. 77 at Page ID # 609]. Stated differently, Plaintiff contends that the "'knock and talk' sequence of events is an essential part of the analysis of the totality of the circumstances required by <u>Graham</u> and <u>Barnes</u>." [Doc. 77 at Page ID # 615].

---

[6] Hearing Audio at 2:26:20–2:27:00.

Further, Plaintiff argues that even though he raised his arm to aim his gun at Officer Latham, there is "abundant evidence in the record that would permit a jury to find that deadly force was not needed." [*Id.*]. Pointing to the *Graham* factors, Plaintiff emphasizes that the County did not have a noise ordinance in effect, and furthermore, that there is nothing illegal about people shooting firearms "on private property in the rural area where Plaintiff lived." [*Id.* at Page ID # 614]. The Officers did not have a warrant to arrest Plaintiff or search the Trailer. Rather, Plaintiff argues, they arrived at his home in the middle of the night without any reason to think a crime, an emergency, or even a party was in progress, failed to make reasonable efforts to identify themselves as law enforcement, lingered on his property even after he did not answer their repeated and loud attempts to get his attention, trespassed on his front porch which was not readily accessible from the outside, pounded on the front of the Trailer, shined brights lights in his face and screamed at him, never warned him they were about to shoot, and then shot him as he stood on the porch in his underwear. And despite all of that, Plaintiff never fired his gun at the Officers. Plaintiff thus contends "[a]ny threat which Plaintiff may have posed to the officers was minimal at best." [Doc. 77 at Page ID # 618]. He describes his theory as "officer-created danger." [*See* Doc. 83 at Page ID # 874].

Plaintiff is correct that *Barnes* requires the Court to consider the relevance of the events preceding the moment when the Officers fired their weapons at Plaintiff. To the extent Defendants argue otherwise, respectfully, they are mistaken.[7] However, *Barnes* does not require the Court to overlook the obvious significance of the fact that Plaintiff pointed a gun at Officer Latham before the Officers fired. Indeed, *Barnes* itself acknowledges that "the precise time of the shooting will often be what matters most." 605 U.S. at 80. Changing the circumstances of this case illustrates

---

[7] Hearing at 2:42:00–2:45:43.

this point: had Plaintiff exited his home holding his gun but keeping it at his side or tucked in his waistband, it may well have been unreasonable for the Officers to shoot, even though Plaintiff was armed and not complying with their instructions to drop his gun. In other words, considering the hour of the night, the loud music, the number of times the Officers had to loudly knock before Plaintiff responded, the lights, Officer Latham's position on the front porch, the non-criminal nature of the earlier 911 call, and the prevalence of gun ownership in the County, it may *not* have been reasonable for the Officers to perceive Plaintiff as an immediate and serious threat simply because he was armed and agitated when he answered the door. *See Driscoll v. Montgomery Cnty. Bd. of Cnty. Comm'rs*, 173 F.4th 794, 800 (6th Cir. 2026) (finding that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead[,]" and that "deadly force [is] constitutionally reasonable only when the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others" (citations and quotation marks omitted)).[8]

But it is undisputed that Plaintiff *did* point the gun at Officer Latham. As a result, even considering all of the preceding circumstances in the light most favorable to Plaintiff, the Officers had probable cause to believe that Plaintiff posed a significant threat of death or serious injury to Officer Latham, who was standing no more than a few feet away from Plaintiff. *See Feagin v. Mansfield Police Dep't*, 155 F. 4th 595 (6th Cir. 2025) (post-*Barnes* case, citing *Plumhoff v. Rickard*, 572 U.S. 765, 776 n.3 (2014) and *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 429 (2017), and observing that "totality of the circumstances" does not require consideration of "whether an officer at some earlier point in time acted in a way that later led to the use of force"

---

[8] In *Driscoll*, the Sixth Circuit affirmed the district court's denial of qualified immunity at the summary judgment stage. The court found the officer "was faced with a noncompliant but non-dangerous person" who "was not breaking any laws," and "had no weapon[.]" 173 F.4th at 804.

15

or whether officer's prior conduct "in some sense set the table for the use of force"); *see also Vaughn ex rel. Estate Isaifan v. Rea*, 174 F.4th 530, 533 (6th Cir. 2026) (finding officers' "split-second choice to repeatedly use deadly force was objectively reasonable," reasoning that it has "consistently found" that "officers may reasonably use deadly force against a noncompliant suspect drawing a firearm."); *Puskas v. Delaware Cnty.*, 56 F.4th 1088 (6th Cir. 2023) ("It's true that officers cannot shoot a suspect merely because he has a gun. But they do not necessarily need to wait until he points it at them." (citations omitted)); *Gambrel v. Knox Cnty.*, 24 F. 4th 391, 405 (6th Cir. 2022) ("In countless cases . . . , we have found that officers had the probable cause that made their shooting lawful when they could reasonably conclude that a suspect might fire a gun at them or use another dangerous weapon against them (even if they turned out to be wrong)." (citing cases)).

Plaintiff points to the results of his state court prosecution and argues that the "criminal trial court and jury determined that none of these officers, including Officer Harrison, faced a true threat." [Doc. 64 at Page ID # 236]. Plaintiff does not, however, address the different standards of proof between his criminal prosecution and the instant civil case. Nor does he acknowledge that the state court criminal proceedings can more properly be understood as addressing Plaintiff's state of mind, whereas "[c]ourts analyze uses of force 'from the perspective of a reasonable officer on the scene[.]'" *Eurton v. Thomas*, No. 25-5733, 2026 WL 1103717, at *5 (6th Cir. Apr. 23, 2026) (quoting *Graham*, 490 U.S. at 396–97); *see also id.* at *4 (noting that "the officer's perspective . . . guides the qualified immunity analysis") (citing *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). Further, the Court notes that the state court's dismissal of the aggravated assault charge as to Officer Creel was based on its finding that Officer Creel was "further removed from the porch than Officer Harrison," and was "not present anywhere during the shooting incident."

16

[Doc. 64-6 at Page ID # 342]. The court found Officer Harrison similarly was "removed from the porch, out of the line of sight, and upon a significantly lower elevation level," but the court did not dismiss the count as to Officer Harrison because he "had an unobstructed view of the movements upon the porch," and because "the actions upon the porch compelled Officer Harrison to discharge his weapon." [*Id.*]. Nothing in the record indicates the jury made a specific finding that Plaintiff acted in self-defense or that a finding of no "true threat" was essential to the jury's verdict. Moreover, during Plaintiff's sentencing the court specifically held: "I'm not going to find as a mitigating factor as requested or invited by defense counsel that [Plaintiff's] conduct neither caused nor threatened [another person to reasonably fear imminent bodily injury]." [Doc. 64-8 at Page ID # 403].

Plaintiff also appears to imply the Officers should have more prominently displayed their badges, given the loud music and possibility that Plaintiff could not hear them identifying themselves. However, again, the Officers' actions are not judged with the 20/20 vision of hindsight, and as long as the Officers' conduct falls within a range of conduct that is considered reasonable, they did not violate the Fourth Amendment. *See Bell v. Korkis*, No. 18-cv-13565, 2025 WL 972830, at *15 (E.D. Mich. Apr. 1, 2025) ("Accordingly, it is well-settled in the Sixth Circuit that in a Fourth Amendment excessive force case, it is improper to consider whether officers used the 'best' or least intrusive force available under the circumstances." (citations omitted)).

Finally, Plaintiff appears to argue that the additional shots fired by either Officer Latham or Officer Harrison amounted to excessive force, even if the first shot did not. However, all of the shots were fired within less than two seconds. Moreover, even after Plaintiff was shot and lying on his porch, the Officers continued to yell at Plaintiff to drop his gun and to "stay down." As a result, the Court finds it was reasonable under the circumstances for the Officers to fire their

17

weapons repeatedly during the two-second time period. *See Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015) (finding second shot reasonable where it was fired "within the time frame in which a reasonable officer could have acted under the perception that Mullins was still armed" (citation omitted)); *see also Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (finding officers' conduct did not constitute excessive force where 15 shots were fired, reasoning that "officers need not stop shooting until the threat has ended").

Accordingly, viewing the facts in the light most favorable to Plaintiff and as they are shown in the bodycam footage, the totality of the circumstances demonstrates that the Officers reasonably believed Plaintiff posted a significant threat of death or serious bodily injury when they used deadly force against him, such that the officers' use of such deadly force did not violate Plaintiff's right under the Fourth Amendment to be free from the use of excessive force. Plaintiff has not demonstrated otherwise.

In the alternative, Plaintiff has not shown that the Officers were on notice that their conduct was unreasonable or unconstitutional. "In the use of force context, where cases are often fact-specific, the Sixth Circuit has instructed that '[p]olice officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.'" *Foster v. Tucker*, No. 3:20-CV-340-KAC-DCP, 2023 WL 2335348, at *4 (E.D. Tenn. Mar. 2, 2023) (quoting *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021)). "Plaintiff must either 'identify a case that put [the officers] on notice that [their] specific conduct was unlawful' or show that this is an 'obvious case' where the prevailing standards 'clearly establish' the answer, even without a body of relevant caselaw." *Foster*, 2023 WL 2335348, at *4 (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021)).

Plaintiff does not cite any case involving circumstances analogous to the case at bar in which a Fourth Amendment violation is found. Plaintiff cites to *Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020) for the proposition that "[o]fficers may not use lethal force simply because someone disobeys their orders." [Doc. 77 at Page ID # 627]. But Plaintiff did not "simply disobey" the Officers' orders to drop his gun—he also *raised the gun and pointed it at Officer Latham*. As set forth above, this is a significant fact distinguishing this case from *Wright*. Plaintiff also cites *Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011), in connection with his argument that "it is a reasonable interpretation of the available evidence that Mr. Spakosky was reacting reasonably based upon the limited information confronting him." [Doc. 77 at Page ID # 632]. But in *Bletz*, which was decided based on the circumstances "immediately preceding the shooting," there was a factual dispute regarding whether the homeowner was lowering his weapon when the officer shot him. 641 F.3d at 752. Similarly, in *Houle v. Marion, Ohio Police Department*, No. 25-3586, 2026 WL 851160 (6th Cir. Mar. 27, 2026), which Plaintiff cites in his supplemental brief [Doc. 83], the court found there was a question of material fact regarding whether the officer's use of deadly force "preceded or came after" the plaintiff's attempt to take the officer's gun, which precluded qualified immunity at the summary judgment stage. *Id.* at *3.

Accordingly, the Court finds the Officers are entitled to qualified immunity on Plaintiff's Fourth Amendment excessive force claim. The same conclusion applies to the extent Plaintiff contends the shooting itself constitutes an unreasonable seizure rather than an excessive force claim. *See Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017) ("An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances. It is not a claim that an officer used

reasonable force after committing a distinct Fourth Amendment violation such as an unreasonable entry.").[9]

Because the Court finds the Officers are entitled to qualified immunity on Plaintiff's excessive force claims, *Monell* liability cannot be imposed on the County based on its alleged failure to train the Officers on uses of force. Defendants' motion for summary judgment will be granted as to Plaintiff's excessive force claims against the Officers in Count I and for the corresponding *Monell* claims. The Court finds the Officers are likewise entitled to dismissal of Plaintiff's state law claims for assault and negligence in their entirety, as these claims are based on Officer Latham's and Officer Harrison's conduct in allegedly failing to properly identify themselves before pointing their guns at Plaintiff and shooting him; and of Plaintiff's state law claim for NIED/IIED to the extent that claim is premised on the shooting. *See Willis v. Neal*, No. 1:04-cv-305, 2006 WL 1129388 (E.D. Tenn. April 24, 2006); *aff'd Willis v. Neal*, 247 Fed. App'x 738 (6th Cir. 2007) (concluding the analysis of qualified immunity under § 1983 and Tennessee state law is coextensive); *see also Nance v. Kilpatrick*, No. 1:18-cv-11, 2019 WL 1409847, *14 (E.D. Tenn. March 28, 2019) ("Tennessee courts employ the same excessive-force analysis in assault and battery claims as federal courts do to analyze these claims under § 1983."); *Paupp v. Hamilton Cnty.*, Case No. 1:18-cv-54, Doc. 54 at Page ID # 1988 (E.D. Tenn. Jan. 29, 2020) ("Further, the Court's finding that Moody's use of force was reasonable under the totality of the circumstances precludes a finding that that same conduct was 'so outrageous that it is not tolerated by civilized society.' Plaintiff therefore cannot prove an essential element of his claim and Moody is entitled to summary judgment on the intentional infliction of emotional distress claim." (quoting *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012))).

---

[9] The Court addresses Plaintiff's "false arrest" claim below.

Plaintiff's motion sought summary judgment only on his claims for excessive force and assault. Because the Court finds Defendants are entitled to summary judgment on these claims, the Court finds Plaintiff is not entitled to summary judgment on these claims. Plaintiff's motion for partial summary judgment [Doc. 63] will therefore be denied.

### C.     The "Knock and Talk" Dispute

Defendants also move for summary judgment on Plaintiff's claim that the Officers' conduct prior to the shooting constituted an unreasonable intrusion onto his property which violated his rights under the Fourth Amendment.

The Fourth Amendment "provides in relevant part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *Florida v. Jardines*, 560 U.S. 1, 6 (2013). "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." *Id.* (other quotation marks omitted) (quoting *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012)).

"Knocking on the front door of a home in order to speak with the occupant—a so-called 'knock and talk'—is generally permissible." *Smith v. City of Wyoming*, 821 F.3d 697, 713 (6th Cir. 2016) (quoting *United States v. Thomas,* 430 F.3d 274, 277 (6th Cir.2005)). "Though the threshold of a house is especially protected by the Fourth Amendment,  and police may not gather information even from a person's front porch without authorization, the police are authorized to conduct a 'knock and talk' for as long as they have consent." *Smith*, 821 F.3d at 713 (citing *Jardines*, 560 U.S. at 4–8) (other citations omitted). That is, "[t]he fact that an encounter is initiated by police officers at the individual's home does not create a 'seizure' in what would otherwise be a consensual contact." *United States v. Nappier*, 155 F. App'x 859, 864 (6th Cir. 2005). However,

21

the "officers' right to enter the property like any other visitor comes with the same limits of that traditional invitation: typically . . . approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Morgan v. Fairfield Cnty.,* 903 F.3d 553, 563 (6th Cir. 2018) (quotation marks omitted) (quoting *Jardines*, 569 U.S. at 8).

Defendants contend that "[b]ecause the officers restricted their movements to the deck area accessible to the public, their initial presence did not violate the Fourth Amendment." [Doc. 68 at Page ID # 440].[10] They also argue that they did not "seize" Plaintiff when they summoned him to his door because Plaintiff did not "submi[t] to their presence or commands prior to the discharge of a firearm." [*Id.* at Page ID # 439].

It appears undisputed that the front porch is part of the curtilage of Plaintiff's home. *See Jardines*, 569 U.S. at 7 ("The front porch is the classic exemplar of an area adjacent to the home and to which the activity of home life extends." (quotation marks and citations omitted)). It is also undisputed that Plaintiff's front porch was positioned several feet off the ground and did not have attached, useable stairs. Accordingly, there is a question of fact regarding whether the front porch was, in fact, "accessible to the public." The fact that Plaintiff did not repair the stairs or otherwise put in place another means of access to the front porch from the outside, when viewed in the light most favorable to Plaintiff, could reasonably show that there was no implicit license or invitation for visitors to knock on Plaintiff's front door. Indeed, the Officers themselves appear to have acknowledged as much when they identified the clear footpath to the back door, which is where they began their encounter. It is also undisputed, and observable on the bodycam footage, that the

---

[10] Defendants also argue that their "continued presence after the shooting remains justified" because they had a "duty to enter to provide life-saving aid" [Doc. 68 at Page ID # 440]. However, as far as the Court can discern, Plaintiff's unreasonable search and/or seizure claim is not premised on the Officers' continued presence after the shooting.

Officers looked through Plaintiff's windows using their flashlights, walked around the outside of Plaintiff's

Trailer, and repeatedly and loudly banged on the walls and door(s) of his Trailer and yelled, "Sheriff's Office."

In their response to Plaintiff's motion for partial summary judgment, Defendants argue that no reasonable juror could conclude the Officers' conduct was inconsistent with applicable precedent. Specifically, Defendants argue:

Here, the record supports that officers:

- Responded to a call involving reported gunfire;
- Approached areas reasonably believed to be functional access points;
- Did not enter the house; and
- Attempted to make contact without forced entry.

No reasonable jury could conclude that this conduct was inconsistent with the implied license of *Jardines* and the community caretaking function as explained by Justice Kavanaugh in *Caniglia*, and summary judgment should be granted to Defendants.

Plaintiff's argument improperly attempts to convert *Jardines* into a per se rule prohibiting movement around a residence or repeated attempts at contact. No such rule exists. In this case, the evidence as provided by [the bodycam footage] is undisputed, and it is clear that Defendants' actions remained within the scope of the implied license of a lawful knock and talk[.]

[Doc. 72 at Page ID # 523].

However, in *Brennan v. Dawson*, 752 F. App'x 276, 283 (6th Cir. 2018), the Sixth Circuit held: "A police officer simply cannot linger and continue to search the curtilage of the home if his knocking at the front door goes unanswered. Those actions are inconsistent with the limits of the implied license recognized in *Jardines*." (citation omitted)). The court went on to contrast this with the law before *Jardines* was decided:

In *Hardesty* [*v. Hamburg Township*], 461 F.3d 646, 654 (6th Cir. 2006), we explained that when "circumstances indicate that someone is home" and an

23

officer's knocking at the front door goes unanswered, "an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage." We held that an officer may travel to the rear of the home when he has reason to believe that the occupant is inside but does not answer the front door.

This Court recently considered the viability of *Hardesty* . . . and concluded that *Jardines* . . . overruled [the] decision[.]

*Brennan*, 752 F. App'x at 282–83 (citing *Morgan*, 903 F.3d at 565) (other citations omitted).

Accordingly, on the current record, the Court does not find an absence of disputed material facts regarding whether the Officers' conduct was within the scope of the implied invitation to enter the property extended to "any visitor." Although the amount of time that the Officers were at Plaintiff's house likely was not unreasonable, there is at least a question of fact as to whether the invitation extended to what Defendants characterize in their briefing as "areas reasonably believed to be functional access points" (*e.g.*, the front porch, the perimeter of the Trailer, and the portion of the interior of the Trailer that was visible to the Officers when they shined their lights through Plaintiff's windows).

There are other exceptions to the warrant requirement beyond consensual, knock-and-talk encounter, however. As mentioned above, Defendants rely on the "community caretaking function," outlined in a concurring opinion by Justice Kavanaugh in *Caniglia v. Strom*, 593 U.S. 194, 198 (2021). But the majority opinion in *Caniglia* makes clear that a broad community-caretaking exception is simply not applicable to homes. 593 U.S. at 198–99; *see also Clemons v. Couch*, 3 F.4th 897, 904 (6th Cir. 2021) ("We now know, based on *Caniglia*, that the community-caretaker exception, to the extent it exists at all, does not apply to the home.").

Even prior to *Caniglia*, the community caretaking exception "could not provide the government with refuge from the warrant requirement except **when delay is reasonably likely to result in injury or ongoing harm to the community at large**." *Clemons*, 3 F. 4th at 904

24

(emphasis added). Defendants mention that the 911 caller reported "gunfire," but they point to nothing in the record to suggest they reasonably believed anyone was actually injured or that the shooting/party was ongoing. *See Brigham City v. Stuart*, 547 U.S. 398 (2006) (warrantless entry reasonable where officers were responding to a noise complaint at 3 a.m., and when they arrived, they observed a "loud" and "tumultuous" fight involving a juvenile and several adults, one of whom was "spitting blood"); *see also United States v. Rohrig*, 98 F.3d 1506 (6th Cir. 1996) (concluding that "the governmental interest in immediately abating an **ongoing nuisance** by quelling loud and disruptive noise in a residential neighborhood is sufficiently compelling to justify warrantless intrusions under some circumstances," and finding that the late hour, the loud music audible from at least a block away, and the "irate group of pajama-clad neighbors outside" demonstrated that time was of the essence in that case (emphasis added)); *Goodwin v. City of Painesville*, 781 F.3d 314 (6th Cir. 2015) (noting that *Rohrig* "is a narrow, fact-specific holding," and not a "broad 'nuisance abatement' exception" to the presumption against the reasonableness of warrantless home entries, and holding that "no reasonable officer could find that five to ten minutes of noise emanating from the Nall home late at night was such an 'immediate, ongoing, and highly objectionable nuisance' as to permit warrantless entry"); *McGraw v. Madison Twp.*, 231 F. App'x 419, 425 (6th Cir. 2007) (affirming denial of qualified immunity where "there was no threat of future violence, and the facts, taken in the light most favorable to McGraw, show that the argument between McGraw and Calandra had ended.").

Accordingly, the Court finds that any reliance on the Officers' community caretaking function or narrow nuisance abatement function is misplaced under the facts of this case. Furthermore, the Officers each testified in their depositions that their purpose in going to Plaintiff's house was to investigate. [*See* Doc. 77-4 at Page ID # 699; Doc. 77-5 at Page ID # 714 & 722;

Doc. 77-6 at Page ID # 733–34 ("Were you investigating a crime? "Yes, sir.")]. The Court acknowledges the Officers' subjective intent is generally not relevant to the Fourth Amendment reasonableness analysis, but mentions it here only because it underscores the inapplicability of the warrant-requirement exceptions discussed in the cases cited above.

Moreover, the Court finds the law regarding intrusions onto a person's curtilage was clearly established as of the date of the incident, April 3, 2022. The limitations of the community caretaking exception and the even more limited "nuisance abatement" exception were clearly established at least since *Caniglia* was decided in 2021, and the limitations of the knock-and-talk exception have been clear at least since 2018, when the Sixth Circuit decided *Morgan*, which clarified that "*Jardines* . . . should guide their actions going forward." 903 F.3d at 565.

Defendants also argue that all of Plaintiff's Fourth Amendment claims in Count I, including any claims related to the knock-and-talk, are barred by *Heck v. Humprey*, 512 U.S. 477 (1994), and the doctrine of collateral estoppel. Defendants vaguely argue that "the consideration of Plaintiff's guilt and rejection of Plaintiff's claims regarding excessive force, unlawful seizure, or lack of justification on the part of the officers was absolutely necessary for the determination of the criminal proceeding." [Doc. 68 at Page ID # 449]. But they cite to no authority or any part of the state court record other than a general citation to the jury instructions from the state court criminal case to support this argument. Defendants also do not adequately address how a claim for an unreasonable search, if successful, would invalidate Plaintiff's assault conviction pursuant to *Heck*.

Whether Plaintiff intends to assert a separate Fourth Amendment "seizure" claim based only on the fact that he answered his front porch door is unclear. He discusses being "coerced" out of his house in his own motion for partial summary judgment, but his motion relates only to his

26

excessive force claims against the Officers. He also claims in his response to Defendants' motion for summary judgment that he was "unlawfully seized twice," with the first time being when he was "forc[ed] out of his residence for a 'knock and talk.'" [Doc. 77 at Page ID # 611]. But the argument that follows this brief statement also concerns his excessive force claim.

Nevertheless, Defendants appear to acknowledge that Plaintiff has asserted such a claim as part of his knock-and-talk claim, and they contend they are entitled to summary judgment on the claim because "there was no submission to the officers' presence or commands prior to the discharge of a firearm." [Doc. 68 at Page ID # 439 (further arguing that "no pre-shooting seizure occurred to support a false arrest claim")].

"A police officer's attempt to perform a knock-and-talk may become coercive and exceed the scope of a consensual encounter if the officer asserts his or her authority, refuses to leave, or otherwise makes 'the people inside feel they cannot refuse to open up.'" *United States v. Mills*, 372 F. Supp. 3d 517, 531 (E.D. Mich. Apr. 5, 2019) (quoting *United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008)); *see also Smith v. City of Wyoming*, 821 F.3d 697, 713 (6th Cir. 2016) ("[A] police attempt to 'knock and talk' can become coercive if the police assert their authority, [or] refuse to leave.") (quoting *Spotted Elk*, 548 F.3d at 655). "Whether or not a knock-and-talk encounter is consensual for purposes of determining if a person was seized will often depend 'on the show of force exhibited by the police[.]'" *Mills*, 372 F. Supp. 3d at 531 (quoting *Thomas*, 430 F.3d at 277). Examples of such shows of force include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mills*, 372 F.3d at 530 (citation omitted).

Here, the police knocked loudly and persistently enough that it woke Plaintiff up. They shined flashlights into his windows and walked around his property. They did not activate their flashing blue lights. The parties agree Officer Latham had already unholstered his own gun and "activated his firearm mounted tactical light" when Plaintiff came to the door [Doc. 85 at Page ID # 899]. Three Officers were present, and although only Officer Latham was on the front porch, Plaintiff testified he heard Officer Latham speaking to another person so he knew at least two individuals were present. The Officers did not command Plaintiff to come out of his home nor did they verbally threaten him.

The record reflects Plaintiff was asleep or could not hear most of the Officers' conduct until they started banging on the wall abutting his front porch. He testified he did not know that the police were doing the banging on the wall, indicating he did not hear them identifying themselves [Doc. 77-7 at Page ID # 755–56]. Instead, he "woke up," checked the time on his cell phone, and then "started for the door." [*Id.* at Page ID # 756]. The entire incident—from the time the Officers arrived and knocked on Plaintiff's back door to the time of the shooting—lasted about five minutes. It is difficult to see how a reasonable person who is largely, if not entirely, unaware of the police's presence at their home can "reasonably believe[] he has no choice" but to submit to the officers' "show of authority" by waking up and essentially immediately answering the door. *See United States v. Thomas*, 430 F.3d 274, 278 (6th Cir. 2005) (citation omitted).

The facts of this case are dramatically different from *Mills*, where 10-15 officers responded to a call, "some of whom were members of the SWAT team and wore tactical gear and carried long guns." 372 F. Supp. 3d at 531–32. The facts are also distinguishable from *State v. Hilliard*, No. E2015-00967-CCA-R3-CD, 2017 WL 3738470 (Tenn. Ct. App. Aug. 29, 2017), which the state court cited in hearing pre-trial motion(s) in Plaintiff's criminal case. [*See* Doc. 77-1 at Page

ID # 655]. In *Hilliard*, six officers went to the defendant's house and "knocked and announced for ten to fifteen minutes before [the defendant] finally opened the door." *Id.* at *7–8. The officers could hear people moving around inside the house and it was the middle of the day, so there was no question people were awake inside and simply not coming to the door. When the defendant opened the door, one of the officers, a detective, asked for consent to search the house, and the defendant refused, so the detective instructed her to step outside. The other officers then drew their weapons and ordered another defendant outside. *Id.* None of this happened in Plaintiff's case.

That said, a reasonable juror could find that the Officers' conduct from the time they left the back of the Trailer up until the time of the shooting converted an otherwise constitutional knock-and-talk into an unreasonable search and/or seizure. Accordingly, the Court finds summary judgment is not warranted on Plaintiff's claim that the Officers exceeded the permissible scope of a consensual knock-and-talk. Defendants' motion for summary judgment will be denied in this regard.

### D. Plaintiff's False Arrest/Unreasonable Seizure Claim

Plaintiff also claims the Officers falsely arrested him. The Court presumes Plaintiff's claim in this regard includes Plaintiff's detention at the scene following the shooting as well as his subsequent arrest for aggravated assault. The Affidavit of Complaint contains a probable cause determination signed by a "Judge/Clerk/Judicial Commissioner," and it states that an "arrest warrant shall issue" [Doc. 68-2 at Page ID # 476]. It is not entirely clear when Plaintiff was "arrested," pursuant to any warrants that issued from the Affidavit of Complaint. Regardless, to state a claim for false arrest under the Fourth Amendment, Plaintiff must plausibly allege that the Officers "lacked probable cause to arrest" him. *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). "An officer possesses probable cause when, at the moment the officer seeks the

29

arrest, 'the facts and circumstances within the officer's knowledge and of which [he] had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense." *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (quoting *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964)).

Based on the clear bodycam footage, the Court finds the officers had probable cause to detain or "arrest" Plaintiff at the scene after he raised his gun and pointed it at Officer Latham. Again, the footage plainly reflects Plaintiff raising the gun and pointing it at Officer Latham, and it is undisputed that "having [Plaintiff] aim the gun at him caused [Latham] to fear for his life." [Doc. 85 at Page ID # 900]. *See State v. Spalding*, No. M2024-00044-CCA-R3-DC, 2026 WL 673190, at *9 (Tenn. Ct. Crim. App. Mar. 10, 2026) ("Mr. Johnson's crime of aggravated assault was complete as soon as Mr. Kelly became aware that Mr. Johnson was pointing a gun at him, causing him to fear being shot."). Also, to the extent Plaintiff is asserting a false arrest claim based on his arrest pursuant to the Affidavit of Complaint (and any warrants issued based thereon), the bodycam footage clearly establishes probable cause to charge Plaintiff with aggravated assault at least as to Officer Latham. Plaintiff does not cite to any evidence in the record to show that Officer Johnston, or any of the Defendants, completed the Affidavit of Complaint with the requisite intent to subject himself to liability for false arrest under state law. *See Stacy v. Clarksville Police Dept.*, 771 F. Supp. 3d 1024, 1039 (M.D. Tenn. 2025) (discussing requirements for overcoming immunity under GTLA for state law false arrest claim).

Moreover, even if there was no probable cause to charge Plaintiff with aggravated assault as to Officer Creel and/or Officer Latham (which the Court does not find), the Sixth Circuit has held that "where no probable cause exists to arrest a plaintiff for a particular crime, but . . . probable cause exists to arrest that plaintiff for a related offense, the plaintiff cannot prevail in a suit alleging

30

wrongful arrest brought pursuant to 42 U.S.C. § 1983." *Voyticky*, 412 F.3d at 676 (citing *Avery v. King*, 110 F.3d 12, 14 (6th Cir. 1997)).

Accordingly, the Court finds the material facts are not in dispute and the Officers are entitled to judgment as a matter of law as to Plaintiff's false-arrest-related claims under both state and federal law. It is therefore unnecessary for the Court to address the parties' arguments regarding collateral estoppel and *Heck* as to these claims, and the Court declines to do so.

### E.      *Monell* Claims

The Court has already determined that the County is entitled to summary judgment as to any *Monell* claim based on the County's failure to train the Officers on uses of force. Moreover, the Court notes that any claims against the Officers in their official capacities are duplicative of the claims asserted against the government entity, and so the official capacity claims will likewise be dismissed. *See Colson v. City of Alcoa,* No. 3:16-CV-377, 2017 WL 4019596, at *5 (E.D. Tenn. Sept. 11, 2017) ("In allowing the municipal liability claims against the City of Alcoa to remain intact, however, the Court will dismiss the official-capacity claims against [the officer defendants] because they are duplicative." (citations omitted)).

This leaves Plaintiff's *Monell* claim based on the County's allegedly unconstitutional official policy regarding responding to 911 calls: "The officers came onto Plaintiff's property because of an official policy of the McMinn County Sheriff's Office that required them to make actual contact with anyone who is the subject of a 911 call no matter whether the call involved a crime or not." [Doc. 77 at Page ID # 615; *see also id.* at 629–30 ("The reason that the officers did not leave was because department policy required officers to investigate all 911 calls no matter how frivolous in nature.")]. Plaintiff cites to the testimony of McMinn County Sheriff Joe Guy and to the testimony of Officer Harrison.

To the extent Plaintiff is alleging the existence of an official policy that requires physical, in-person contact with anyone who is the subject of a 911 call, Plaintiff mischaracterizes the testimony. Sheriff Guy testified that the MCSO "respond[s] to all of our calls . . . one way or the other." [Doc. 77-3 at Page ID # 693]. He then clarified, "If it's something we can handle by phone if it's a question or just to speak with an officer we might make a phone call then. We're going to respond either way in person or by phone, yes." [*Id.*]. Officer Harrison testified that "anytime we receive a 911 call we respond to the call and investigate the call." [Doc. 77-5 at Page ID # 713]. When asked, "Why wouldn't the investigation of the call involve interviewing the person making the complaint?" Officer Harrison responded, "I'm not sure. Because **most of the time** on those type of calls we just go and check and see if we hear noise or shots being fired." [*Id.* (emphasis added)].

"A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must identify the policy, connect the policy to the [County] itself and show that the particular injury was incurred because of the execution of that policy." *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (quotation marks and citation omitted). "There must be 'a direct causal link' between the policy and the alleged constitutional violation such that the County's 'deliberate conduct' can be deemed the 'moving force' behind the violation." *Id.* (quoting *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)).

The record is devoid of any evidence that a general policy of responding to 911 calls directly caused any constitutional violations in this case. The proof Plaintiff cites in opposition to Defendants' motion clearly reflects that the County maintains significant flexibility in how it responds to 911 calls, and nothing in the record indicates that the Officers climbed onto Plaintiff's porch, looked through Plaintiff's windows, etc., because they were required to by a MCSO policy.

Again, there is nothing unconstitutional about the Officers approaching Plaintiff's home and attempting to engage him in a consensual conversation about the noise complaint they received. Defendants motion will therefore be granted as to Plaintiff's official policy *Monell* claim.

Finally, to the extent Plaintiff is attempting to assert other *Monell* claims, the Court notes he has not alleged any "prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice" that, for example, its training program "was deficient and likely to cause injury." *Wright v. City of Euclid*, 96 F.3d 852, 881 (6th Cir. 2020) (quotation marks and citation omitted). Similar proof is required for failure to supervise claims and claims based on a "custom of tolerance" theory of municipal liability. *Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005). Accordingly, any *Monell* claims premised on the County's alleged unofficial policies tolerating constitutional violations or on its alleged failure to properly supervise the officers is subject to dismissal.

Therefore, Defendants' motion will be granted as to Plaintiff's *Monell* claims against the County.

### F.     State Law Claims for NIED/IIED

Plaintiff also asserts state law claims for NIED and IIED. Defendants argue that Tennessee Code Annotated § 29-20-205(2) "specifically immunizes" the County from liability for Plaintiff's IIED claims [Doc. 68 at Page ID # 464]. Plaintiff does not respond to this argument, and the Court finds the plain language of the statute compels the result Defendants advocate. Plaintiff's IIED claim against the County will be dismissed pursuant to the exception from the removal of immunity for claims related to "infliction of mental anguish" in Tennessee Code Annotated § 29-20-205(2).

As for Plaintiffs' NIED/IIED claims against the Officers, the Court has already determined that any such claim arising from the actual shooting is subject to dismissal. During the Hearing, Plaintiff also clarified he is asserting an NIED/IIED claim based on the Officers' alleged failure to provide Plaintiff with adequate medical care after the shooting.

Defendants argue that "Plaintiff does not articulate facts reflecting what outrageous conduct occurred herein that is not tolerated by a civilized society." [Doc. 68 at Page ID # 464]. In his response, Plaintiff cites to his allegation that the Officers knew he was "bleeding profusely and that without immediate medical attention he had a high risk of dying." [Doc. 77 at Page ID # 641].

The undisputed material facts demonstrate that one of the Officers "made a radio call for EMS to respond to the scene less than thirty seconds after officers fired at [Plaintiff]." [Doc. 85 at Page ID # 901]. Within three minutes, one of the Officers asked for medical supplies, and within four minutes, one of the Officers had put on medical gloves. The Officers had just finished radioing information about the number and location of Plaintiff's wounds and asking Plaintiff whether any other individuals were inside the Trailer. [Hearing Ex. 4 at 1:57:45–1:59:00]. At one point Plaintiff asks, "Can I just sit up?" The Officers responded that they thought "it was probably best" for Plaintiff to stay in the same position [Hearing Ex. 4 at 1:59:20–1:59:40]. The bodycam footage shows Officer Harrison moving a large object to clear a path between Plaintiff and the edge of the porch where the stairs would normally attach.

Within eight minutes, another officer arrived at the scene and was on the porch with a medical supply bag. At least two officers then began tending to Plaintiff's wounds, including Officer Harrison. By ten minutes after the shots, "EMS is on the deck and has assumed the care of [Plaintiff]." [*Id.*]. EMS removed Plaintiff from the porch sixteen minutes after he was shot [*id.*].

The Court further notes that the Officers were conversing with Plaintiff in the aftermath of the shooting and Plaintiff was able to speak loudly and clearly.

The parties' briefing on the medical-care-related claims focuses almost entirely on Fourteenth Amendment case law regarding rendering aid to pretrial detainees. [*See* Doc. 68 at Page ID # 443–45; Doc. 77 at Page ID # 640–42]. However, as discussed above and during the Hearing, Plaintiff is not pursuing a standalone Fourteenth Amendment claim. To the extent Plaintiff contends these cases support his NIED/IIED claims, the Court notes two of them involve suspects in custody who could not breathe, and the officer-defendants were aware the suspects could not breathe. *See Jones v. City of Cincinnati*, 521 F.3d 555 (6th Cir. 2008); *Estate of Owensby v. Cincinnati*, 414 F.3d 596 (6th Cir. 2005). Here, by contrast, Mr. Spakosky spoke with the Officers clearly and loudly the entire time he was injured and waiting for EMS. He only complains about trouble breathing *after* EMS arrives and is preparing to remove him from the porch.

Plaintiff also cites *Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017), for the proposition that the police "cannot prioritize activities 'unrelated to securing the scene' or 'unnecessary to their duties' over trying to save the suspect's life." [*See* Doc. 77 at Page ID # 642]. Plaintiff does not identify any such activities that the Officers in this case allegedly prioritized. The record reflects that as soon as the Officers had appropriate medical supplies, they did in fact begin providing first aid. Officer Harrison can clearly be heard asking for medical supplies, and Officer Creel says he does not have anything "for that," referring to Plaintiff's wounds, and all he has is a tourniquet. At least one officer can be seen standing close to and observing Plaintiff throughout the relevant time.

This conduct, which is undisputed and largely if not entirely captured on video, was far from "outrageous," as required for IIED claims. *See Cothran v. Durham School Servs., L.P.*, 666

35

S.W.3d 369, 379 (Tenn. Ct. App. 2022) ("Our Supreme Court has repeatedly and unwaveringly held that to satisfy the outrageousness element, the defendant's alleged conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." (citations and quotation marks omitted)). And, contrary to Plaintiff's position, the Officers' actions were within the range of reasonableness, such that there was no breach of duty as required for an NIED claim. *Id.* at 376–78. Plaintiff has not cited to any proof in the record or authority to show otherwise. The Court finds the Officers are therefore entitled to summary judgment on Plaintiff's NIED and IIED claims.

### G.     Punitive Damages

In their motion for summary judgment, Defendants cite authorities applicable to Plaintiff's punitive damages claim against the County and against the Officers in their official capacities. [*See* Doc. 68 at Page ID # 456–57]. Defendants are correct that governmental entities—including government officials sued in their official capacities—are immune from liability for punitive damages under both federal and Tennessee state law. *See Crowley v. Anderson Cnty.*, No. 3:17-cv-169, 2018 WL 8919930, at *11 (E.D. Tenn. Feb. 15, 2018) (dismissing punitive damages claim against county and county employees; holding that county defendant "is immune from punitive damages" under federal and state law, and a "suit against a public servant in his official capacity is a suit against the entity itself" (citations omitted)). However, as far as the Court can tell, the cited authorities do not support the proposition that the Officers are immune from liability for the § 1983 claims asserted against them in their individual capacities. *See, e.g., McNeil v. Comm. Probation Servs., LLC*, 803 F. App'x 846, 847–48 (6th Cir. 2020) ("It's true that punitive damages

are not available against counties. And it's true that in some instances courts have treated a request for punitive damages as an indication that a suit seeks individual liability.")

Accordingly, Defendants' motion will be granted to the extent Plaintiff seeks punitive damages against the County, but denied to the extent it seeks dismissal of Plaintiff's claim for punitive damages against the Officers.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiff's motion for partial summary judgment [Doc. 63] is **DENIED**. Defendants' motion for summary judgment [Doc. 68] is **GRANTED IN PART AND DENIED IN PART**.

Count I **SURVIVES** as to Plaintiff's claim that the Officers' conduct in front of the Trailer after conducting the Back Door Knocks and before the shooting exceeded the permissible scope of a knock and talk and constituted an unreasonable search and/or seizure in violation of the Fourth Amendment. Count I is **DISMISSED** as to any other claims.

Counts II and III are **DISMISSED**. For clarity's sake, by dismissing Counts II and III, the Court intends to dismiss all claims for liability against the County based on *Monell*, and any excessive force claims against the Officers.

Count IV and Count IX, which reflect Plaintiff's false arrest claims, are **DISMISSED**.

Count V and Count VI, for Negligence and Negligent Supervision pursuant to the Tennessee GTLA, are **DISMISSED**.

Count VII, for NIED and IIED, is **DISMISSED**.

Count VIII, for negligence, is **DISMISSED**.

Count X, for state law assault, is **DISMISSED**.

In addition, Defendants' motion is **GRANTED** as to all official capacity claims against each of the Officers, and as to any claims for punitive damages against the County. Defendants' motion is **DENIED** as to punitive damages against the Officers.

SO ORDERED.

ENTER:

/s/ _____
MIKE DUMITRU
UNITED STATES MAGISTRATE JUDGE

38